# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALLIANT TECHSYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 9813-CB |
| | ) | |
| MIDOCEAN BUSHNELL | ) | |
| HOLDINGS, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 3, 2015
Date Decided: April 24, 2015

William M. Lafferty, Kevin M. Coen, and D. McKinley Measley of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Thomas G. Rafferty and Antony L. Ryan of CRAVATH, SWAINE & MOORE LLP, New York, New York; *Attorneys for Plaintiff.*

David E. Ross of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Matthew Solum and David S. Flugman of KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendant*.

**BOUCHARD, C.**

## I.    INTRODUCTION

This action requires the Court to interpret the terms of a stock purchase agreement to determine whether a dispute over accounting methodology relating to the calculation of net working capital must be resolved by an accountant under a purchase price adjustment procedure or by a court as a claim for breach of a representation and warranty.

In 2013, Alliant Techsystems Inc. ("ATK") agreed to purchase Bushnell Group Holdings, Inc. ("Bushnell") from MidOcean Bushnell Holdings, L.P. ("MidOcean") for $985 million, subject to post-closing adjustments to be made in accordance with the terms of a stock purchase agreement (the "Agreement"). The Agreement contains two "sole and exclusive" remedy provisions. One provision requires the parties to use an independent accounting firm of national reputation to resolve disputes concerning adjustments to the estimated purchase price, including disputes concerning the calculation of net working capital. It contains a specified cap. The other provision governs claims for indemnification. It imposes a lower cap on either party's ability to recover from the other for any claims concerning the transaction, including any claim for breach of a representation or warranty, except in certain defined circumstances. One exception is for matters falling within the purchase price adjustment procedure.

After the transaction closed, ATK challenged a number of items underlying MidOcean's estimate of net working capital on the ground that the accounting treatment for such items did not comply with United States generally accepted accounting principles ("GAAP"). MidOcean objected, asserting that disputes over accounting methodology cannot be raised as part of the purchase price adjustment procedure. The

1

filing of this lawsuit followed. ATK seeks an order of specific performance requiring MidOcean to submit the current dispute to an accounting firm under the purchase price adjustment procedure. MidOcean seeks a declaration that claims asserting purported violations of GAAP must be resolved by a court in accordance with the provisions governing claims for indemnification. The net amount of the parties' dispute stands at approximately $22 million, or a little over two percent of the estimated purchase price.

This Court and courts in other jurisdictions have reached different results in determining whether a dispute over accounting methodology may be resolved as part of a purchase price adjustment process.[1] This is not surprising. Claims of this nature are creatures of contract and counterparties to a transaction are free to contractually order their affairs as they wish. The critical issue for the Court to decide here is what the shared intentions of the contracting parties were when they entered the Agreement.

For the reasons discussed below, I conclude based on the plain terms of the Agreement that the present dispute over the calculation of net working capital fairly may be raised under the purchase price adjustment procedure even though that dispute implicates issues of accounting methodology that also could form the basis of an

---

[1] *Compare Matria Healthcare, Inc. v. Coral SR LLC,* 2007 WL 763303, at *7 (Del. Ch. Mar. 1, 2007) (finding that the dispute over accounting methodology that could fit within both the AAA arbitration process for claims and the purchase price adjustment process before a settlement accountant must be resolved by the settlement accountant), *with OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1095 (Del. Ch. 2006) (finding that a dispute over accounting methodology raised during the purchase price adjustment procedure that would have resulted in a 54% reduction of the purchase price constituted a disguised indemnity claim that must be resolved in legal arbitration and not by an accountant).

2

indemnification claim for breach of a representation and warranty. I further conclude that where a dispute could be brought either as part of the purchase price adjustment procedure or as an indemnification claim, the Agreement specifically provides that the exclusive remedy provision in the purchase price adjustment procedure trumps the exclusive remedy provision for indemnification claims. Accordingly, judgment is entered in ATK's favor granting its request for specific performance and denying MidOcean's motion for summary judgment.

## II.    BACKGROUND[2]

### A.    The Parties

Plaintiff Alliant Techsystems Inc. is a Delaware corporation with its principal place of business in Arlington, Virginia. ATK is a developer and manufacturer of aerospace, defense, and sporting products.

Non-party Bushnell Group Holdings, Inc. is a Delaware corporation that sells branded sports optics, outdoor accessories, and performance eyewear. Together with its subsidiaries, Bushnell is referred to at times as the "Company."

Defendant MidOcean Bushnell Holdings, L.P. is a Delaware limited partnership.

---

[2] Unless noted otherwise, the facts recited in this opinion are based on the well-pled facts admitted to be true in MidOcean's Verified Answer (the "Answer"). *See Warner Commc'ns Inc. v. Chris–craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Ch. 1989), *aff'd*, 567 A.2d 419 (Del. 1989) (TABLE). I also consider the unambiguous terms of the stock purchase agreement, which was attached to the complaint. *See OSI Sys., Inc.*, 892 A.2d at 1089, 1095 ("The court also may consider the unambiguous terms of exhibits attached to the pleadings . . . .") (granting judgment on the pleadings).

3

## B. The Purchase Agreement

On September 4, 2013, ATK agreed to acquire Bushnell for $985 million (including debt), subject to certain post-closing adjustments. The final Purchase Price was to be determined through a process (the "Purchase Price Adjustment Procedure") that would take into account, among other things, whether any adjustment should be made for changes in Net Working Capital between the date of the Agreement and the Closing of the transaction.[3]

Net Working Capital is defined as the sum of all current assets minus the sum of all current liabilities "calculated in accordance with GAAP and otherwise in a manner consistent with the practice and methodologies used in the preparation of" certain financial statements of the Company.[4] The assumed amount of Net Working Capital in the Agreement is $188.1 million.[5] The Net Working Capital Adjustment is the amount by which Net Working Capital at Closing is greater or less than $188.1 million.

### 1. Section 2.4 of the Agreement

As is common in stock purchase agreements, the Agreement contains a multi-step process to determine the final Purchase Price. That process is spelled out in Section 2.4.

---

[3] Unless otherwise defined herein, all capitalized terms have the meaning given to them in the Purchase Agreement.

[4] Compl. Ex. A § 1.1 (the "Purchase Agreement") (definition of "Net Working Capital"). The relevant financial statements are the Company's audited consolidated balance sheets as of December 31, 2010, December 31, 2011, and December 31, 2012, and the related audited consolidated statements of income, cash flows and stockholders' equity for each fiscal year of the Company then ended. *See* Purchase Agreement § 3.4(a)(i).

[5] Purchase Agreement § 1.1 (definition of "Net Working Capital Adjustment").

4

First, no later than three business days before the Closing, MidOcean was required to deliver to ATK a statement setting forth reasonably detailed calculations of certain amounts from which an estimated Purchase Price would be computed.[6] Relevant here, MidOcean was required to provide its good faith estimate as of the Closing of the Net Working Capital of the Company and the related Net Working Capital Adjustment from the $188.1 million of Net Working Capital assumed in the Agreement.

Second, no later than 60 days after the Closing, ATK (as the buyer now in possession of the business) was required to deliver to MidOcean reasonably detailed calculations of certain amounts (the "Proposed Closing Date Calculations"), including the Net Working Capital of the Company as of the Closing and the related Net Working Capital Adjustment.[7]

Third, after receiving the Proposed Closing Date Calculations from ATK, MidOcean had 45 days to review them and to deliver to ATK a written notice of dispute (the "Purchase Price Dispute Notice") specifying "in reasonable detail those items or amounts in [ATK's] calculation of the Proposed Closing Date Calculations as to which [MidOcean] disagrees (the 'Disputed Items') and the basis for such disagreement."[8]

If MidOcean delivered to ATK a Purchase Price Dispute Notice, the parties were then required to "use their respective commercially reasonable efforts to reach agreement

---

[6] *Id.* § 2.4(a).

[7] *Id.* § 2.4(b)(i).

[8] *Id.* § 2.4(b)(ii).

on the Disputed Items set forth in the Purchase Price Dispute Notice in good faith during the 30-day period commencing on the date Buyer receives the applicable Purchase Price Dispute Notice from the Seller."[9] If ATK and MidOcean were unable to agree upon a final resolution of the Disputed Items, they were required to submit the remaining Disputed Items immediately "to an independent accounting firm of national reputation mutually acceptable" to them (the "Accounting Firm").[10]

Under the Agreement, the Accounting Firm must act "as an expert, and not as an arbitrator" and may only issue determinations with respect to Disputed Items based "on the definitions and other applicable provisions of [the] Agreement."[11] The Agreement limits the recovery for a Purchase Price adjustment to the amounts held in two escrow accounts that were established at the Closing: the Adjustment Escrow Account ($5 million) and the Indemnity Escrow Account ($7,387,500).[12]

The Agreement expressly states that the Purchase Price Adjustment Procedure is the sole and exclusive method for resolving the Disputed Items: "[T]he procedures set forth in this Section 2.4 for resolving disputes with respect to the Proposed Closing Date Calculations shall be the sole and exclusive method for resolving any Disputed Items."[13]

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *See Id.* §§ 2.4(a)(i)-(ii), c(ii).

[13] *Id.* §2.4(b)(iv).

## 2. Article IX of the Agreement

Article IX of the Agreement sets forth the parties' indemnification rights. In Section 9.1, MidOcean agreed to indemnify and hold harmless ATK for, among other things, "any breach or default in performance by the Company or the Seller of any covenant or obligation of the Company or the Seller . . . [and] any breach of, or inaccuracy in, any representation or warranty of the Company or the Seller contained in this Agreement."[14] Among other things, the Company represented and warranted to ATK that its year-end 2010, 2011, and 2012 audited financial statements and its April 30, 2013, unaudited financial statements were "prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby."[15]

Section 9.3 of the Agreement imposes certain limitations on the parties' indemnification rights. Specifically, Section 9.3(b)(ii) provides that MidOcean will not be required to indemnify ATK unless the aggregate of all claims "exceeds the Indemnity Threshold, and then only to the extent such Losses exceed the Indemnity Threshold,"[16] which could be as high as $4,925,000.[17] The parties also agreed to limit their respective liability for indemnity claims to the amount in the Indemnity Escrow Account.[18]

---

[14] *Id.* § 9.1(a)(i)-(ii).

[15] *Id.* § 3.4(a).

[16] *Id.* § 9.3(b)(ii).

[17] More precisely, the Indemnity Threshold is defined as "the greater of (i) zero and (ii) (a) $4,925,000 less (b) the Interim Loss Estimate Amount." *Id.* § 1.1.

[18] *Id*. § 9.3(c)(i) ("Seller shall not be required to indemnify any Buyer Indemnified Party and shall not have any liability under Section 9.1 for amounts in the aggregate in excess

Section 9.5 of the Agreement provides that the "sole and exclusive remedy" for any claim relating to the transaction shall be governed and limited by the indemnification provisions in Article IX, with certain exceptions:

> Except as otherwise expressly provided in any Ancillary Document and, in the case of the Buyer Indemnified Parties as provided in the Representation and Warranty Insurance Policy, from and after the Closing, ***the sole and exclusive remedy*** of each Buyer Indemnified Party and Seller Indemnified Party as against any Indemnifying Party, with respect to all claims of any nature whatsoever relating to the Transactions, including any breach of any representation, warranty, covenant or agreement contained in this Agreement, shall be pursuant to and limited by the indemnification provisions set forth in this <u>Article IX</u>, it being understood that (x) the foregoing limitations shall not apply in respect of a claim of fraud or for the remedies of injunctive relief or specific performance set forth herein and ***(y) nothing in this sentence shall operate to interfere with or impede the operation of the provisions of <u>Section 2.4</u>*** or <u>6.2(e)</u>.[19] Notwithstanding anything to the contrary set forth herein, but except as otherwise expressly provided in any Ancillary Document, (A) any amount to which any Buyer Indemnified Party is entitled pursuant to this <u>Article IX</u> (other than with respect to Interim Losses) shall be limited to, and solely satisfied from, the funds that remain in the Indemnity Escrow Account at the time . . . .[20]

The language in proviso (y) of the first sentence emphasized above ("Proviso (y)") is an exception to the sole and exclusive remedy limitation in Section 9.5 that carves out disputes falling within the operation of the Purchase Price Adjustment Procedure in Section 2.4.

---

of the Indemnity Escrow Amount (other than with respect to Interim Losses) and Seller shall not be required to indemnify any Buyer Indemnified Party and shall not have any liability under <u>Section 9.1</u> other than out of the Indemnity Escrow Account (other than with respect to Interim Losses).").

[19] *Id*. § 9.5 (emphasis added).

To prevent double recoveries, the Agreement provides that the "amount of any Loss for which indemnification is provided" would be net of, among other things, "any actual cash payments, setoffs or cash recoupment of any payments . . . in each case actually received, realized or retained by the indemnified party as a result of any event giving rise to a claim for such indemnification."[21]

### 3. Section 2.4 vs. Section 9.5

There are two significant differences between the exclusive remedy provisions in Sections 2.4 and 9.5 of the Agreement that bear on the parties' dispute in this case. First, Purchase Price disputes under Section 2.4 are to be resolved by an Accounting Firm on a compressed schedule[22] while indemnification claims under Section 9.5 are to be resolved in a judicial proceeding. Second, for a Purchase Price dispute, ATK can recover from MidOcean beginning with its first dollar of loss against the funds available in both the Adjustment Escrow and Indemnity Escrow Accounts, *i.e.*, up to $12,387,500.[23] For an indemnification claim, with certain exceptions not relevant here, ATK may only recover from MidOcean if its claim exceeds the Indemnity Threshold (up to $4,925,000) and any recovery from MidOcean is limited to the funds available in the Indemnity Escrow

---

[21] *Id*. § 9.3(d).

[22] *Id.* § 2.4(b)(ii) ("The Accounting Firm shall be requested to render a written determination of the Disputed Items . . . within 45 days after referral of the matter to such Accounting Firm . . . .").

[23] *Id.* §§ 2.4(a)(i)-(ii), (c)(ii).

9

Account, *i.e.*, up to $7,387,500.[24]  As reflected in the Agreement, an insurance policy provides ATK an additional potential source of recovery for certain indemnification claims.[25]

### C.   Events Leading to the Present Dispute

On or about October 31, 2013, MidOcean delivered to ATK a statement of the estimated Purchase Price and its components, including its good faith estimate of Net Working Capital and the related Net Working Capital Adjustment.[26]  MidOcean's estimate of Net Working Capital was $192,407,000.  Because this estimate exceeded the assumed amount of $188.1 million in the Agreement, an upward adjustment to the Purchase Price was made in MidOcean's favor relating to Net Working Capital in the amount of $4,307,000.[27]  At the Closing, which occurred on or about November 1, 2013, ATK paid the adjusted Purchase Price to MidOcean, less certain amounts that ATK paid into specified escrow accounts.[28]

On December 30, 2013, ATK delivered to MidOcean its Proposed Closing Date Calculations.  ATK calculated that Net Working Capital as of Closing was $166,447,000.  Based on this calculation, ATK asserted that MidOcean owed it a net amount of

---

[24] *Id.* §§ 1.1 (definition of "Indemnity Threshold"), 9.3(b)(ii), 9.3(c), 9.5.

[25] *See id.* § 9.9 ("Seller and the Company acknowledge that Buyer is entering into the Representation and Warranty Insurance Policy . . . .").

[26] Answer ¶ 28.

[27] Compl. ¶ 28.  The complaint states that the estimated Net Working Capital Adjustment was $4,317,800.  I believe this is a typographical error, but the difference is immaterial.

[28] Answer ¶ 29.

$25,960,000 relating to Net Working Capital.[29]  In its cover letter, ATK expressly reserved its right to pursue claims under the indemnification provisions of the Agreement.[30]

On March 14, 2014, MidOcean gave a Purchase Price Dispute Notice to ATK in which it disputed, among other things, the accuracy of ATK's calculation of Net Working Capital.[31]  According to MidOcean, its calculation deviated from ATK's calculation because, among other reasons, ATK "ignored the requirement that the Proposed Closing Date Calculations are determined based on the practices and methodologies used by the Company in the preparation of the Financial Statements referenced in Section 3.4(a)(i) of the Agreement."[32]

Delivery of the Purchase Price Dispute Notice initiated the thirty-day period during which the parties were to use commercially reasonable efforts to resolve the Disputed Items.[33]  During this process, the parties resolved their disagreements over certain Disputed Items worth over $3.6 million,[34] but approximately $22 million remains in dispute, all of which relates to the calculation of Net Working Capital.

---

[29] In its Proposed Closing Date Calculations, ATK also disagreed with MidOcean's estimate of Cash and Cash Equivalents.  That dispute has been resolved.

[30] Answer Ex. C.

[31] Answer Ex. D at 1.

[32] *Id*. at 2.

[33] *See* Purchase Agreement § 2.4(b)(ii).

[34] Answer ¶ 39.

11

On May 15, 2014, MidOcean sent a letter to ATK advising that it would not submit the remaining Disputed Items to an Accounting Firm for final resolution.[35] MidOcean stated "that the discrepancy in the parties' position is based largely, if not entirely," on whether certain items "were accounted for in accordance with generally accepted accounting principles (*see* Agreement § 3.4) and in accordance with the inventory representation in the Agreement (*see* Agreement § 3.22)."[36] MidOcean thus asserted that the dispute "cannot be resolved through the working capital arbitration process or by an accounting firm pursuant to Section 2.4(b)(ii) of the Agreement," but instead had to be resolved in accordance with Article IX of the Agreement.[37]

On May 23, 2014, ATK sent a letter to MidOcean disagreeing with its position. ATK openly acknowledged that the parties' dispute involved whether ATK's "Proposed Closing Date Calculations . . . were prepared in accordance with GAAP"[38] and asserted that the dispute nonetheless should be resolved by an Accounting Firm under the Purchase Price Adjustment Procedure in Section 2.4 of the Agreement.[39] ATK proposed three accounting firms and asked MidOcean to identify which of those firms were

---

[35] Answer Ex. B.

[36] *Id.* at 1.

[37] *Id.* at 2.

[38] Answer Ex. E at 3.

[39] *Id.* at 1-2.

acceptable to it or to propose an alternative independent accounting firm of national reputation.[40]

On May 30, 2014, MidOcean reiterated its position that ATK was alleging a breach of a representation and that "any claim for an alleged breach of a representation was limited to the indemnity process."[41] On June 24, 2014, ATK filed this lawsuit.

### D. Procedural History

ATK's complaint contains one count for specific performance seeking to direct MidOcean to submit the remaining Disputed Items immediately to an Accounting Firm under Section 2.4(b)(ii) of the Agreement.[42]

On July 28, 2014, MidOcean filed its answer and a counterclaim. The counterclaim seeks a declaration that ATK's claims asserting purported violations of GAAP must be resolved through the indemnity procedure set forth in Article IX.[43]

On November 7, 2014, ATK filed a motion for judgment on the pleadings. On December 5, 2014, MidOcean filed a cross-motion for summary judgment. On February 3, 2015, I heard oral argument on both motions.

---

[40] *Id.* at 3.

[41] Answer Ex. F at 2.

[42] Compl. ¶ 50.

[43] Answer ¶ 41.

13

## III.     LEGAL ANALYSIS

### A.      The Legal Standard

Under Court of Chancery Rule 12(c), ATK's motion for judgment on the pleadings must be denied unless, accepting as true all well-pled facts admitted in the answer and drawing all reasonable inferences from those facts in MidOcean's favor,[44] "no material issue of fact exists and the movant is entitled to judgment as a matter of law."[45] Similarly, MidOcean's motion for summary judgment will be granted only if it is able to demonstrate that there are no material facts in dispute and that it is entitled to judgment as a matter of law.[46]

Under Delaware law, which governs the Agreement,[47] the "proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal,"[48] and "judgment on the pleadings . . . is a

---

[44] *See Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Ch. 1989), *aff'd*, 567 A.2d 419 (Del. 1989).

[45] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) ("In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.").

[46] Ct. Ch. R. 56(c).

[47] Purchase Agreement § 10.5.

[48] *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) (*quoting Klair v. Reese*, 531 A.2d 219, 222 (Del. 1987)).

14

proper framework for enforcing unambiguous contracts."[49] That the parties dispute how to interpret the Agreement does not render it ambiguous. Rather, under Delaware law, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[50] In my view, the present dispute can be resolved based on unambiguous provisions of the Agreement.

## B. The Parties' Contentions

As discussed above, Section 2.4 of the Agreement sets forth the sole and exclusive remedy for resolving disputes over adjustments to the Purchase Price and Section 9.5 of the Agreement sets forth the sole and exclusive remedy for resolving indemnification claims. The fundamental issue to be decided in this case is which of these two exclusive remedy provisions governs the parties' dispute over the calculation of Net Working Capital given that this dispute, as ATK admits, also could form the basis for an indemnification claim under Section 9.5 for breach of a representation or warranty in the Agreement.[51]

---

[49] *NBC Universal, Inc. v. Paxson Comm. Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).

[50] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[51] As noted above, the Company represented and warranted to ATK that its year-end 2010, 2011, and 2012 audited financial statements and its April 30, 2013 unaudited financial statements were "prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby." Purchase Agreement § 3.4(a). It is reasonably inferable that the amount of Net Working Capital assumed in the Purchase Agreement ($188.1 million) was derived from these financial statements. *See* Oral Arg.

15

MidOcean argues that Sections 2.4 and 9.5 of the Agreement were intended to address different types of disputes. According to MidOcean, the "Accounting Firm dispute resolution process in [Section 2.4 of] the Agreement is limited deliberately to the 'items or amounts in Buyer's calculation of the Proposed Closing Date Calculations as to which the Seller disagrees' " and was never intended to "resolve questions over the proper interpretation of GAAP."[52] MidOcean further contends that, to the extent the provisions overlap, Section 9.5 provides the exclusive remedy for resolving disputes over GAAP.[53]

ATK argues based on the definition of Net Working Capital in the Agreement that certain (but not all) disagreements over compliance with GAAP relating to the calculation of Net Working Capital – including the ones at issue here – fall within the scope of matters that the Accounting Firm may resolve as part of the Purchase Price Adjustment Procedure in Section 2.4. ATK further argues that the Agreement contains a hierarchy requiring that such disputes, even though they also could form the basis of an indemnification claim under Section 9.5, be resolved by the Accounting Firm. In other words, MidOcean argues that the exclusive remedy provision in Section 2.4 trumps the exclusive remedy provision in Section 9.5 when the provisions overlap.

---

Tr. 10 (Feb. 3, 2015). MidOcean's estimate of Net Working Capital presumably was based on the same accounting methodology used in these financial statements, which ATK challenges in various respects as not being calculated in accordance with GAAP.

[52] MidOcean Op. Br. 21 (quoting Purchase Agreement § 2.4(b)(ii)).

[53] MidOcean Reply Br. 16-18.

16

For the reasons discussed below, I agree with ATK's interpretation.

### C. The Present Dispute over Compliance with GAAP must be Resolved Under the Purchase Price Adjustment Procedure

In my opinion, the plain terms of the Agreement compel the conclusion that the parties' disagreement over the calculation of Net Working Capital falls within the scope of the Purchase Price Adjustment Procedure in Section 2.4 of the Agreement even though that disagreement implicates issues concerning compliance with GAAP that could form the basis for an indemnification claim under Section 9.5.

To begin, Section 2.4 provides a procedure to resolve disputes over "Disputed Items," which consists of "those items or amounts in Buyer's calculation of the Proposed Closing Date Calculations as to which the Seller disagrees."[54] Net Working Capital is one of the Proposed Closing Date Calculations to which MidOcean has disagreed.

Net Working Capital is defined in the Agreement, in relevant part, as follows:

> the sum of all current assets . . . of the Group Companies <u>less</u> the sum of all current liabilities . . . of the Group Companies, in each case determined on a consolidated basis without duplication as of 12:01 a.m. New York time on the Closing Date and *calculated in accordance with GAAP and otherwise in a manner consistent with the practices and methodologies used in the preparation of the Financial Statements referenced in <u>Section 3.4(a)(i)</u>* . . . . .[55]

Importantly, the Agreement requires that MidOcean prepare its estimated Purchase Price, which includes its good faith estimate of Net Working Capital, in accordance with the

---

[54] Purchase Agreement § 2.4(b)(ii).

[55] *Id.* § 1.1 (definition of "Net Working Capital") (emphasis added).

17

definitions in the Agreement.[56] It similarly requires that ATK prepare its Proposed Closing Date Calculations, including its calculation of Net Working Capital, in accordance with those same definitions,[57] and that the Accounting Firm's determination ultimately be based on those same definitions.[58]

To be faithful to the definition of Net Working Capital in the Agreement quoted above, Net Working Capital had to be: "[i] calculated in accordance with GAAP and [ii] otherwise in a manner consistent with the practices and methodologies used in the preparation of the Financial Statements referenced in Section 3.4(a)(i)."[59] GAAP is not a set of prescriptive rules. Instead, GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management."[60]

Thus, applying the two parts built into the definition of Net Working Capital, if MidOcean was following GAAP when it submitted its good faith estimate of Net Working Capital, ATK could not seek to adjust Net Working Capital when it prepared its Proposed Closing Date Calculations by selecting another GAAP-compliant accounting

---

[56] *Id.* § 2.4(a) (requiring that the components of MidOcean's estimated Purchase Price be "calculated in accordance with the terms of this Agreement (including the applicable definitions set forth herein)").

[57] *Id.* § 2.4(b)(i) (requiring that ATK prepare a reasonably detailed calculation of Net Working Capital "in a manner consistent with the definitions thereof and otherwise in accordance with the terms of [the] Agreement.").

[58] *Id.* 2.4(b)(ii) (Accounting Firm's determination "must be based solely on definitions and other applicable provisions of [the] Agreement").

[59] *Id.* § 1.1 (definition of "Net Working Capital").

[60] *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979).

treatment different from Bushnell's historical accounting practices and methodologies. ATK concedes as much.[61]  On the other hand, if MidOcean was not following GAAP when it submitted its good faith estimate of Net Working Capital, then in my view Section 2.4 of the Agreement permitted ATK to put forward a calculation of Net Working Capital it believes complies with GAAP when it prepared its Proposed Closing Date Calculations.

To construe Section 2.4 otherwise and require ATK to calculate Net Working Capital in the same manner Bushnell had done historically, *even if that methodology did not comply with GAAP*, would be to read the words "calculated in accordance with GAAP" out of the definition of Net Working Capital and to ignore the multiple requirements in Section 2.4 to adhere to the definitions in the Agreement in connection with the Purchase Price Adjustment Procedure.  Such an interpretation would contravene basic principles of contract construction requiring that contracts be read as a whole and that meaning be given to all the provisions of the contract whenever possible.[62]

Had the parties intended to proscribe ATK from challenging whether MidOcean's estimate of Net Working Capital was based on calculations compliant with GAAP as part of the Purchase Price Adjustment Procedure, they logically would have defined the

---

[61] *See* ATK Op. Br. 20.

[62] *See, e.g., Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.' ") (citation omitted); *Northwestern Nat.'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) ("Contracts must be construed as a whole, to give effect to the intention of the parties.") (citing *E.I. DuPont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

method of calculating Net Working Capital for purposes of Section 2.4 to require the application of the same accounting methodologies Bushnell had used historically in preparing its financial statements – period – without additionally requiring that those calculations be made in accordance with GAAP.[63] They did not do so and thus left open the possibility that ATK could challenge MidOcean's proposed Net Working Capital Adjustment based on a failure to comply with GAAP.

MidOcean has not advanced a textual interpretation of the term Net Working Capital that compels a different conclusion. To the contrary, MidOcean readily acknowledges that it "was required by Section 2.4 to provide to ATK its 'good faith estimate of Net Working Capital,' which, by definition had to be 'calculated in accordance with GAAP.' "[64]

MidOcean asserts as a general proposition that "it is not unusual for an accounting firm's role in dispute resolution to be limited to determining whether calculations are correct based only on the accounting principles implemented by a seller in preparing financial statements" because the " 'purpose of a post-closing purchase price adjustment

---

[63] In resolving a similar purchase price adjustment dispute, this Court entered an order explicitly limiting the authority of an independent accounting firm in this manner based on the terms of the contract at dispute in that case. *See Gen. Dynamics Corp. v. Orbital Scis. Corp.*, 2011 WL 552342 (Del. Ch. Feb. 15, 2011) (ORDER) ("The authority of the Independent Accounting Firm shall be limited strictly . . . [to determining certain amounts] based on the application of the same accounting principles" that were used in the preparation of financial statements and net working capital exhibits set forth in the purchase agreement).

[64] MidOcean Reply Br. 13 (quoting Purchase Agreement §§ 2.4(a), 1.1 (definition of "Net Working Capital")).

20

is to account for changes in the Seller's financial position between the pre-closing balance sheet date and the closing date balance.' "[65]  That would be a commercially sensible and logical way for a buyer and seller to structure a stock purchase transaction. The difficulty for MidOcean, however, is that is not what the parties here agreed to do. Rather, as discussed above, the definition of Net Working Capital they chose leaves open the possibility that ATK may challenge MidOcean's estimate of Net Working Capital as not being compliant with GAAP, and the Agreement explicitly requires that the Purchase Price Adjustment Procedure adhere to this and the other definitions in the Agreement.

The parties also explicitly agreed that recourse to the Accounting Firm would be the "sole and exclusive method for resolving any Disputed Items"[66] and that this remedy would trump in the event of a conflict with the exclusive remedy provision in Section 9.5. The trumping provision is found in Proviso (y) in Section 9.5, quoted below:

> [T]he sole and exclusive remedy of each Buyer Indemnified Party and Seller Indemnified Party as against any Indemnifying Party, with respect to all claims of any nature whatsoever relating to the Transactions, including any breach of any representation, warranty, covenant or agreement contained in this Agreement, shall be pursuant to and limited by the indemnification provisions set forth in this Article IX, it being understood that . . . *(y) **nothing in this sentence shall operate to interfere with or impede the operation of the provisions of Section 2.4** or 6.2(e).*[67]

---

[65] MidOcean Reply Br. 22, 22 n.12 (quoting Basil Imburgia and Brian Ong, *Accounting & Financial Due Diligence—Post M&A Disputes*, Practicing Law Institute Corporate Law and Practice Course Handbook Series, June 2009, at 6).

[66] Purchase Agreement § 2.4(b)(iv).

[67] *Id.* § 9.5 (emphasis added).

The inclusion of Proviso (y) confirms that the parties contemplated that there could be circumstances in which a claim covered by the indemnification provisions in Article IX also could be the subject of a dispute under the Purchase Price Adjustment Procedure governed by Section 2.4. If that were not the case, there would have been no reason to include Proviso (y) in Section 9.5.

Read in that context, Section 9.5 establishes a hierarchy for resolving disputes in the event of an overlap between the Purchase Price Adjustment Procedure in Section 2.4 and the indemnification provisions in Section 9.5. In such event, the Agreement requires that disputes falling within the ambit of the Purchase Price Adjustment Procedure in Section 2.4 must be resolved by the Accounting Firm.[68] Thus, because the present dispute over Net Working Capital is encompassed by Section 2.4 for the reasons discussed above, that dispute must be resolved by the Accounting Firm.

### D.    MidOcean's Interpretation of the Agreement is Without Merit

Apart from making the general observation that it is not unusual for parties to limit an accounting firm's role to applying the same accounting principles used by a seller, which I find did not occur here for the reasons discussed above, MidOcean advances two textual arguments that the parties never intended to have the Accounting Firm resolve disputes over compliance with GAAP. I address each in turn.

---

[68] In this sense, the Purchase Agreement operates similarly to the one at issue in *Matria Healthcare*, 2007 WL 763303, at *2, where the Court held that the parties had agreed to a hierarchy for resolving disputes that "could . . . fit within both the arbitration provision [for resolving misrepresentation claims] and the arbitration provision for adjustments to be made by the Settlement Accountant."

22

First, MidOcean contends that the intent of the Agreement was to limit the Accounting Firm to considering questions of "pure mathematics."[69] It bases this argument on the fact that the definition of Disputed Items in Section 2.4(b)(ii) refers to "items or amounts" and that Section 2.4 requires the Accounting Firm to act "as an expert and not as an arbitrator."[70] In my opinion, the use of those terms in Section 2.4 does not support such a restrictive view of the role of the Accounting Firm.

According to commonly used dictionaries,[71] the word "item" means "[a] single article or unit in a collection" or "[a]n entry in an account"[72] and the word "amount" means "[t]he total of two or more quantities" or "[a] number; a sum."[73] Thus, the phrase "items or amounts" as used in Section 2.4 is sufficiently broad in my view to encompass accounting methodology, *i.e.*, that the Accounting Firm may make an expert determination of each component of Net Working Capital ("items") as well as the quantity, or dollar value, of those entries ("amounts"). To that end, this and other courts

---

[69] MidOcean Op. Br. 6.

[70] MidOcean Op. Br. 6-7, 21-23; MidOcean Reply Br. 21-22, 25.

[71] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); *see also Nationwide Emerging Managers, LLC v. NorthPointe Hldgs., LLC*, — A.3d —, 2015 WL 1317705, at *11 (Del. Mar. 18, 2015, revised Mar. 27, 2015) (citing *Lorillard*, 903 A.2d at 738).

[72] American Heritage Dictionary of the English Language 932 (5th ed. 2011).

[73] *Id.* 60.

have construed similar language to permit accounting firms to settle disputes over accounting methodology when resolving purchase price adjustment disputes.[74]

Limiting the Accounting Firm to resolving purely math questions would be inconsistent in my view with the directive in the Agreement that the Accounting Firm serve as an "expert" since little, if any, accounting expertise would be required simply to perform mathematical calculations. Although the Agreement specifically provides that the function of the Accounting Firm is not to serve as an "arbitrator," that does not rule out that it fairly may be called upon to apply normal accounting principles (*i.e.*, GAAP) when serving the function of an expert. One of primary cases upon which MidOcean relies, the Seventh Circuit's decision in *Omni Tech Corp. v. MPC Solutions Sales, LLC*,[75] supports this conclusion. There, the court found that the phrase "act as an expert and not as an arbitrator means that [the accounting firm] will resolve the dispute as accountants do—*by examining the corporate books and applying normal accounting principles plus any special definitions the parties have adopted*—rather than by entertaining arguments from lawyers and listening to testimony."[76]

---

[74] *See Matria Healthcare*, 2007 WL 763303, at *2, *6-8 (finding that settlement accountant could consider accounting methodology in resolving adjustments or disputes over "amounts or items"); *see also HBC Solutions Inc. v. Harris Corp.*, 2014 WL 6982921, at *2-3, *7-9 (S.D.N.Y. Dec. 10, 2014) (finding use of purchase price adjustment before an accountant to be proper where dispute notice set forth "each disputed item or amount"); *Severstal U.S. Hldgs., LLC v. RG Steel, LLC* 865 F.Supp.2d 430, 434-36, 444 (S.D.N.Y. 2012) (allowing settlement accountant to consider accounting methodology to resolve disputes over "any items" in protest notice).

[75] 432 F.3d 797 (7th Cir. 2005).

[76] *Id.* at 799 (emphasis added).

To be sure, in taking on this role, the Accounting Firm may be confronted by some level of argumentation akin to the type of adversarial process of an arbitration or judicial proceeding. But, in my view, the parties would not have selected an "independent accounting firm of national reputation" to serve as an "expert" if all they wanted that firm to do was to engage in a bean-counting exercise. Instead, such a selection supports the notion that they intended the expert to consider each side's position[77] and to apply genuine expertise to resolve purchase price adjustment disputes promptly. When it comes to deciding questions of GAAP in that context, accounting firms are particularly well-positioned to do so.

Second, MidOcean argues that "any claim that ***could*** be brought as an indemnification claim ***must*** be brought as an indemnification claim"[78] on the theory that the second sentence of Section 9.5 operates, in effect, as the ultimate trumping provision in the Agreement because it states, in relevant part, that *"[n]otwithstanding anything to the contrary set forth herein … any amount to which any Buyer Indemnified Party is* entitled pursuant to this <u>Article IX</u> . . . *shall be limited to, and solely satisfied from, the funds that remain in the Indemnity Escrow Account at the time*."[79] MidOcean similarly asserts that any failure on its part to comply with the requirement in Section 2.4 to

---

[77] The Purchase Agreement contemplates two rounds of written submissions for this purpose – an opening presentation and a response from each side. Purchase Agreement § 2.4(b)(ii).

[78] MidOcean Op. Br. 19.

[79] Purchase Agreement § 9.5 (emphasis added).

calculate its good faith estimate of Net Working Capital in accordance with GAAP should be asserted as a claim for breach of a covenant, recovery for which also would be limited to the funds available in the Indemnity Escrow Account.[80]

The flaw in MidOcean's argument is that the second sentence of Section 9.5 simply provides that *if* a claim is properly brought as indemnification claim, then the funds available as a remedy for such a claim are limited to the funds in the Indemnity Escrow Account. This sentence does not address *whether* a claim that could fall within either Section 2.4 or Section 9.5 must be resolved under one provision or the other. That question is resolved by Proviso (y) in the first sentence of Section 9.5 which, as discussed above, provides that the sole and exclusive remedy in Section 2.4 for resolving Disputed Items in the Purchase Price Adjustment Procedure trumps the indemnification provision in Section 9.5 when the two provisions overlap. Reading the two sentences of Section 9.5 together in this manner gives complete meaning to both sentences, whereas MidOcean's interpretation would render meaningless the inclusion of Proviso (y) in the first sentence of Section 9.5.

Finally, in arguing for a different result, MidOcean relies primarily on two cases in which courts have held that disputes over accounting methods must be resolved under an indemnity provision rather than a purchase price adjustment provision: then-Vice Chancellor Strine's decision in *OSI Systems, Inc. v. Instrumentarium Corp.*,[81] and the

---

[80] MidOcean Reply Br. 13.

[81] 892 A.2d 1086 (Del. Ch. 2006).

26

New York Court of Appeals' decision in *Westmoreland Coal Co. v. Entech, Inc.*[82] Both cases are distinguishable for the simple reason that the purchase agreements in those cases operated differently than the Agreement here.

In particular, in both *OSI Systems* and *Westmoreland*, the court found that the buyer was required to apply the same accounting principles during the purchase price adjustment process that the seller had used historically.[83] By contrast, as discussed above, I interpret Section 2.4 of the Agreement here to operate differently to permit ATK to challenge MidOcean's estimate of Net Working Capital as failing to comply with GAAP in connection with the Purchase Price Adjustment Procedure.

*OSI Systems* also is distinguishable because the purchase agreement in that case did not contain a remedy hierarchy similar to the one in the Agreement here, which expressly provides that the Purchase Price Adjustment Procedure shall be the "sole and exclusive remedy" for disputes falling within its ambit and shall trump the "sole and exclusive remedy" provision for indemnification claims. Although the agreement in *Westmoreland* provided that "the remedies set forth in the indemnification provisions were the parties' 'exclusive remedies' for misrepresentation or breach of any warranty

---

[82] 794 N.E.2d 667 (N.Y. 2003).

[83] *OSI Sys., Inc.*, 892 A.2d at 1091 (finding that purchase price adjustment procedure "appears on its face to simply contemplate the use of an Independent Accounting Firm if there are differences of opinion about the amount of Modified Working Capital as of the Closing Date *when applying the same Transaction Accounting Principles used in the Reference Statement in a consistent manner*") (emphasis added); *Westmoreland Coal Co.*, 794 N.E.2d at 670 ("The purchase price adjustment provisions [required the seller] to prepare the closing date certificate 'on a basis *consistent* with the preparation of the Interim Financial Statements.' ").

contained in the Agreement,"[84] that agreement did not contain an exception like Proviso (y) in this case. Other courts also have distinguished *Westmoreland* on this basis.[85]

\* \* \*

Nothing in this opinion should be read to suggest that I have reached any conclusion that ATK or MidOcean failed to comply with GAAP in calculating Net Working Capital. Rather, this opinion simply concludes that, under the terms of the Agreement, the parties' present dispute is to be resolved by an Accounting Firm.

## IV. CONCLUSION

For the foregoing reasons, ATK's motion for judgment on the pleadings under Court of Chancery Rule 12(c) is GRANTED and MidOcean's motion for summary judgment is DENIED. MidOcean is ordered to immediately submit all of the remaining Disputed Items to an Accounting Firm for resolution in accordance with Section 2.4(b)(ii) of the Agreement. An implementing Order of Final Judgment accompanies this Memorandum Opinion.

---

[84] *Id.* at 669.

[85] *See HBC Solutions Inc. v. Harris Corp.*, 2014 WL 6982921, at \*7 (S.D.N.Y. Dec. 10, 2014) (distinguishing *Westmoreland* where the agreement at issue "explicitly carves out" purchase price adjustment disputes from the "sole and exclusive remedy" provision); *Violin Entm't Acquisition Co. v. Virgin Entm't Hldgs., Inc.*, 871 N.Y.S.2d 613, 613-14 (N.Y. App. Div. 2009) (distinguishing *Westmoreland* where the indemnification provision "can only be interpreted, consistent with the accounting arbitration provision, to exclude financial misrepresentations or deviations from GAAP that are contained in the final Net Working Capital schedule, that affect that schedule, and that can be resolved by a purchase price adjustment").

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ALLIANT TECHSYSTEMS, INC., )
)
      Plaintiff, )
)
v. ) C.A. No. 9813-CB
)
MIDOCEAN BUSHNELL )
HOLDINGS, L.P., )
)
      Defendant. )

## ORDER OF FINAL JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED this 24th day of April, 2015, for the reasons stated in the Memorandum Opinion of today's date, that:

1. Defined terms have the meaning set forth in the Memorandum Opinion.

2. Plaintiff ATK's motion for judgment on the pleadings under Court of Chancery Rule 12(c) is granted. MidOcean is ordered to immediately submit all of the remaining Disputed Items to an Accounting Firm for resolution in accordance with Section 2.4(b)(ii) of the Agreement.

3. Defendant MidOcean's cross motion for summary judgment under Court of Chancery Rule 56 is denied. By virtue of granting ATK's motion for judgment on the pleadings, MidOcean's counterclaim is dismissed with prejudice.

4. Under Court of Chancery Rule 54(d), costs are awarded to ATK as the prevailing party.

_____
Chancellor